MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
REED R. KATHREIN (139304)
STANLEY S. MALLISON (184191)
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
  – and –
WILLIAM S. LERACH (68581)
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

SCHATZ & NOBEL, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
NANCY A. KULESA
330 Main Street
Hartford, CT  06106
Telephone:  860/493-6292
860/493-6290 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIK HANSEN, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> THOMAS L. CRONAN, III, KEVIN A. DeNUCCIO, PIERRE R. LAMOND, VINOD KHOSLA, VIVEK RAGAVAN, DENNIS P. WOLF, JOEL M. ARNOLD, DENNIS L. BARSEMA, GAURAV GARG, CRAIG M. GENTNER, RANDALL J. KRUEP, WILLIAM E. MISKOVETZ and PANKAJ PATEL, <br><br> Defendants. | No. <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a securities class action on behalf of all persons who acquired the publicly traded securities of Redback Networks Inc. ("Redback" or the "Company") between April 12, 2000 and October 10, 2003 (the "Class Period"), including former shareholders of Abatis Systems Corporation ("Abatis Systems") who acquired Redback shares in Redback's October 3, 2000 acquisition of Abatis Systems, against certain of Redback's current and former officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Redback is a provider of telecommunications networking equipment that enables carriers and service providers to deploy high-speed access and services to the Internet and corporate networks.  Redback's product lines, which consist of the SMS family of subscriber management systems and the SmartEdge product families, combine networking hardware and software.  In November 2003, the Company filed a voluntary pre-packaged plan of reorganization under Chapter 11 of the United States Bankruptcy Code and as such is not named as a defendant herein.

3.      Beginning in FY 2000, Redback and Qwest Communications, Inc. ("Qwest") announced a series of multi-year contracts between the two companies whereby Qwest would be buying products and services from Redback and Redback would be buying products and services from Qwest.

4.      Thereafter, during FY 2000 and 2001, Redback reported quarter after quarter of artificial revenues and earnings which included the Company's transactions with Qwest:

| Period | Redback Sales to Qwest | Qwest Purchases from Redback | Total Revenues | Earnings/‹Loss› |
|--------|------------------------|------------------------------|----------------|----------------|
| FY 2000 | $41.5 million -or- 15% of Redback's total revenues | $3 million | $278 million | ‹$1 billion› |
| FY 2001 | $41 million -or- 18% of Redback's total revenues | $10.5 million | $227.5 million | ‹$4.1 billion› |

5.      During the Class Period, while the Company's stock traded at artificially inflated prices due to defendants' misstatements, trading as high as $179 per share on June 30, 2000, defendants sold over $142 million worth of their own stock into the open market at inflated prices. Defendants also caused the Company to use its inflated stock as acquisition currency to purchase

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 1 -

1   Abatis Systems for over $636 million in October 2000 and to undertake a registered secondary

2   offering of more than 2.4 million shares of Redback stock on April 19, 2001.

3           6.      However, the true facts which were known by each of the defendants, but concealed

4   from the investing public during the Class Period, were as follows:

5           (a)      Qwest had only agreed to make the large purchases of Redback products it did

6   not want or need in exchange for receiving free shares of Redback stock;

7           (b)      Redback was giving shares of its stock to Qwest insiders in exchange for sales

8   contracts from Qwest; and

9           (c)      Qwest had no obligation to make further purchases from Redback.

10           7.      Suddenly, on October 14, 2003, *The Wall Street Journal* revealed that a federal grand

11   jury was investigating business transactions between Qwest and 11 of its vendors and that Redback

12   was part of the investigation.  The grand jury was investigating whether former Qwest executives

13   took discounted stock from some vendors, including Redback, in exchange for giving them business,

14   some of which Qwest did not need.

15           8.      Additionally, the Denver, Colorado regional office of the SEC is conducting an

16   investigation titled *In the Matter of Issuers Related to Qwest*.  In connection with that investigation,

17   the SEC is examining various transactions and business relationships involving Qwest and 11

18   companies having vendor relationships with Qwest, including Redback.  The SEC is investigating

19   whether Redback's transactions and relationships with Qwest were appropriately disclosed in

20   Redback's public filings and other public statements.  The SEC has been investigating Qwest's

21   accounting practices and Qwest has announced restatements lowering previously reported revenue

22   by $2.5 billion for 2000 through 2002.

23           9.      In addition, the U.S. Attorney in Denver is investigating Qwest and its relationships

24   with certain of its vendors, including Redback.  In connection with that investigation, the U.S.

25   Attorney seeks documents and information from Redback and seeks interviews and/or grand jury

26   testimony from persons associated or formerly associated with Redback, including certain Redback

27   officers.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 2 -

**JURISDICTION AND VENUE**

10.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

11.     (a)     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

        (b)     The Company's principal executive offices are in San Jose, California, where the day-to-day operations of the Company are directed and managed.

**THE PARTIES**

12.     Plaintiff Erik Hansen purchased Redback publicly traded securities as described in the attached certification and was damaged thereby.

13.     Non-party Redback is a provider of telecommunications networking equipment that enables carriers and service providers to deploy high-speed access and services to the Internet and corporate networks.  Redback is a Delaware corporation headquartered at 300 Holger Way, San Jose, California 95134.   In November 2003, the Company filed a voluntary pre-packaged plan of reorganization under Chapter 11 of the United States Bankruptcy Code.  Redback has 183 million shares of common stock traded on the Nasdaq National Market under the ticker symbol "RBAKD."

14.     Defendant Kevin A. DeNuccio ("DeNuccio") has served as President, Chief Executive Officer ("CEO") and a director of Redback since 2001.  On August 19, 2003, DeNuccio sold $150,000 worth of his Redback stock at artificially inflated prices.

15.     Defendant Pierre R. Lamond ("Lamond") served as Chairman of the Board of Directors of Redback from 1996 through May 2003.

16.     Defendant Joel M. Arnold ("Arnold") has served as Senior Vice President of Worldwide Field Operations of Redback since 2002.  Prior to joining Redback, Arnold was with Qwest from June 1998 to December 2001, and most recently served as Qwest's executive vice president of global business sales. Prior to that, he served as Qwest's senior vice president of global business markets, senior vice president of general business, and regional vice president of national accounts.  Arnold helped engineer the relationship between Redback and Qwest during the Class Period.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 3 -

17.     Defendant Thomas L. Cronan III ("Cronan") has served as the Chief Financial Officer ("CFO") and Senior Vice President-Finance and Administration of Redback since January 2003 and served as its Secretary and General Counsel from 2001-2003.

18.     Defendant Vinod Khosla ("Khosla") served as a director of Redback from 2000 through May 2003.  Khosla has been a general partner with the venture capital firm of Kleiner Perkins Caufield & Byers ("Kleiner Perkins") from February 1986 to the present.  Kleiner Perkins owned a substantial investment in Qwest and Khosla also served on the Qwest Board of Directors.

19.     Defendant Dennis P. Wolf ("Wolf") was Redback's Senior Vice President of Finance and Administration and Chief Financial Officer from January 2001 through January 2003.

20.     Defendant Vivek Ragavan ("Ragavan") was Redback's CEO and President from July 2000 until May 2001.  Between February 2001 and May 2001, Ragavan sold almost $2.5 million worth of his Redback stock at artificially inflated prices.

21.     Defendant Dennis L. Barsema ("Barsema") was Redback's President, CEO and a director from November 1997 to July 2000.  Between August 2000 and December 2000, Barsema sold over $65 million worth of Redback stock at artificially inflated prices.

22.     Defendant Gaurav Garg ("Garg") has served as a director of Redback since May 2001 and previously served as a founder and Senior Vice President of Product Management at Redback from August 1996 through May 2001.  Between October 2000 and August 2003, Garg sold more than $42 million worth of Redback stock at artificially inflated prices.

23.     Defendant Craig Gentner ("Gentner") was Redback's Vice President of Finance, CFO and Corporate Secretary from 1999 to 2001.  During October 2000, Gentner sold more than $15.6 million worth of Redback stock at artificially inflated prices.

24.     Defendant Randall J. Kruep ("Kruep") was Redback's Vice President of Worldwide Sales from 1999 to 2001 and its Vice President of Sales from 1997-1999. Between August 2000 and October 2000, Kruep sold more than $9.6 million worth of Redback stock at artificially inflated prices.

25.     Defendant William E. Miskovetz (Miskovetz") was Redback's Vice President of Engineering from 1998 to 2001.  Between June 2000 and August 2000, Miskovetz sold more than $2.6 million worth of Redback stock at artificially inflated prices.

26.     Defendant Pankaj Patel ("Patel") was Redback's Senior Vice President of Engineering from March 2000 to January 2003.  Patel joined Redback in March 2000 when Siara Systems Inc. was acquired by Redback.  In March 2001, Patel sold almost $4 million worth of Redback stock at artificially inflated prices.

27.     The individuals named as defendants in ¶¶14-26 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Redback's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶35-36, 39-42, 44, 46-54 and 56, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**SCIENTER**

28.     In addition to the above-described involvement, each Individual Defendant had knowledge of Redback's problems and was motivated to conceal such problems.  Defendant Wolf and then Cronan, as CFO's of Redback, were responsible for financial reporting and communications with the market.  Many of the internal reports showing Redback's forecasted and actual growth were prepared by the finance department under Wolf and then Cronan's direction.  Defendant Barsema, then Ragavan, and then DeNuccio, as President and CEO, and defendant Lamond as Chairman, were responsible for the financial results and press releases issued by the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 5 -

1  Company.  Each Individual Defendant sought to demonstrate that he could lead the Company

2  successfully and generate the growth expected by the market.

3  **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

4  29.     Each defendant is liable for (i) making false statements, or (ii) failing to disclose

5  adverse facts known to him about Redback.  Defendants' fraudulent scheme and course of business

6  that operated as a fraud or deceit on purchasers of Redback publicly traded securities was a success,

7  as it (i) deceived the investing public regarding Redback's prospects and business; (ii) artificially

8  inflated the prices of Redback's publicly traded securities; (iii) allowed defendants to obtain larger

9  bonuses which were directly tied to the performance of Redback shares; (iv) allowed defendants to

10  arrange to sell and actually sell in excess of $142 million worth of Redback shares at artificially

11  inflated prices; (v) caused plaintiff and other members of the Class to purchase Redback publicly

12  traded securities at inflated prices; (vi) allowed defendants to use Redback's inflated stock as

13  acquisition currency to purchase Abatis Systems; and (vii) allowed defendants to conduct a

14  registered and underwritten stock offering of Redback stock in April 2001.

15  **SUBSTANTIVE ALLEGATIONS**

16  30.     Redback is a provider of telecommunications networking equipment that enables

17  carriers and service providers to deploy high-speed access and services to the Internet and corporate

18  networks. The product lines, which consist of the SMS family of subscriber management systems

19  and the SmartEdge product families, combine networking hardware and software. These product

20  families are designed to enable customers to create end-to-end regional and national networks that

21  support major broadband access technologies, as well as the new services that these high-speed

22  connections support. The SMS platform of subscriber management systems enables service

23  providers and carriers to provision, aggregate and manage broadband and dial-up subscribers and

24  services through a single, unified platform.

25  31.     On November 28, 1999, Redback and Siara Systems, Inc. ("Siara"), a Delaware

26  corporation, announced that they had entered into a Merger Agreement and Plan of Reorganization

27  (the "Merger Agreement") wherein Siara would merge with and into the Company.  Upon

28  consummation of the merger, the holders of capital stock of Siara received an aggregate of

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS           - 6 -

1   131,341,986 shares of common stock of Redback, representing approximately 38% of the

2   Company's total common stock.

3       32.   In addition, pursuant to the Merger Agreement, Promod Haque, Vinod Khosla and

4   Vivek Ragavan, members of Siara's board of directors, became members of Redback's board of

5   directors; Ragavan, the Chief Executive Officer of Siara and a member of Siara's board of directors,

6   became the President and Chief Operating Officer of Redback after the merger; William Kind and

7   Pankaj Patel, officers of Siara, also became executive officers of Redback.

8       33.   Defendant Khosla who was also a member of the board of directors of Qwest was

9   now a director of Redback and was, therefore, in the unique position of knowing the importance of

10  the relationship between Redback and Qwest.

11      34.   Additionally, Redback's Senior Vice President of Field Operations, defendant

12  Arnold, who was responsible for developing Redback's business strategy and implementing its

13  strategic partnerships was formerly with Qwest.  Prior to joining Redback, defendant Arnold was the

14  executive vice president of global business sales at Qwest from September 1991 to December 2001.

15  At Qwest, Arnold was responsible for the global business markets strategic business unit.  Arnold

16  carried his relationships with Qwest's global sales directors over to Redback.

17             **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
             **ISSUED DURING THE CLASS PERIOD**

18

19      35.   On April 12, 2000, Redback reported record results for the quarter ended March 31,

20  2000.  The press release stated, in relevant part, as follows:

21        Net revenues for the first quarter of 2000 were $34.2 million, compared with
      $6.5 million for the same period in the prior year, an increase of 424 percent.  Pro

22        forma diluted net income for the first quarter of 2000 was $5.6 million or $0.05 per
      share after giving effect to the Company's one-for-one stock split effective April 3,

23        2000, and excluding acquisition-related and stock compensation charges and the
      research and development expense related to Siara Systems' operations.  This

24        compares to the first quarter of 1999 pro forma net loss of $2.7 million or $(0.16) per
      share on a post-split basis.  Before pro forma adjustments, net loss for the first

25        quarter of 2000 was $85.2 million or $(0.96) per share on a post-split basis compared
      to a net loss of $3.8 million or $(0.23) per share on a post-split basis for the same
      period in the prior year.

26

27        "The first quarter of 2000 was a period of expansion for Redback in the
      subscriber management market," said Dennis Barsema, chief executive officer at
      Redback.  "Redback continued its momentum in the North American market with

28        both incumbent local exchange carriers (ILECs) and competitive local exchange

carriers (CLECs), and announced significant new CLEC wins, including Covad Communications and the newly launched Maverix.net.

36.     On July 12, 2000, Redback issued a press release reporting record revenues for the quarter ended June 30, 2000.  The press release stated, in relevant part, as follows:

> Net revenues for the second quarter of 2000 were $48.7 million, compared with $11.1 million for the same period in the prior year, an increase of 340 percent. Pro forma net loss for the second quarter of 2000 was $5.7 million or $(0.05) per share, which excludes acquisition-related and stock compensation charges.  This compares to the second quarter of 1999 pro forma net loss of $2.6 million or $(0.06) per share.  Before pro forma adjustments, net loss for the second quarter of 2000 was $286.7 million or $(2.41) per share compared to a net loss of $3.7 million or $(0.08) per share for the same period in the prior year.  All share and per share amounts reflect the Company's two-for-one stock split effective April 3, 2000.

> "The second quarter of 2000 was a period of strong execution for Redback," said Dennis Barsema, chief executive officer of Redback Networks.  "The Company continued its momentum in the metropolitan optical networking market with the launch and first production shipments of the Smartfldge 800," stated Barsema.  "The SmartEdge platform has been well received by Redback customers and prospects, and we have received multi-million dollar orders from both carriers and service providers."  Redback completed its testing of the SmartEdge platform and shipped its first production SmartEdge 800 units in the second quarter, with general availability scheduled for the third quarter.

37.     On September 25, 2000, Qwest announced that Qwest Cyber.Solutions LLC ("QCS"), the largest enterprise Application Service Provider ("ASP"), had been awarded a 5-year contract worth $18 million from Redback.  The press release stated, in relevant part, as follows:

> The Redback contract win signifies a major milestone for both QCS and the ASP industry, as it represents the largest enterprise ASP contract to date.

> As a successful and growing company in the aggressive Internet infrastructure market, Redback developed a plan that would create added competitive advantage for the company.  By using QCS' ASP solution to connect and streamline their internal and external enterprise resource planning, customer relationship management and manufacturing operations, Redback will be empowered to focus on driving revenues and creating more satisfied customers.

> "At Redback, our aggressive schedule for turning out product requires us to have a system that keeps pace with our high customer demand.  So we chose QCS to provide our IT application infrastructure because of their ability to respond quickly and enable us to refocus on the business of satisfying our customers," said Vivek Ragavan, CEO and president of Redback.  "With today's market becoming increasingly competitive, we appreciate the value brought by QCS' ASP services that will allow us to further accelerate our business."

> The complex integrated ASP solution brings together Oracle's ERP applications and Siebel system's CRM applications with additional applications to create a truly integrated solution that will ensure the availability and movement of business critical data from Redback's sales ordering, manufacturing and delivery

cycle all the way through to customer care.  QCS will provide Redback with its Ultimate Freedom(TM) product, which includes the entire package of ASP services ranging from software to hosting, and ongoing management for this integrated solution.  Additionally, QCS will host and manage four of Redback's already existing applications that will connect to the Oracle applications.

"Redback is moving at breakneck speed and needs to be confident that their system will not slow them down," said John Charters, president and CEO of Qwest Cyber.Solutions.  "By combining  multiple, best of breed applications in a fully hosted and managed environment, our manufacturing ASP solution will deliver the performance, scalability and efficiency that will keep Redback tracking for future successes."

38.     On October 3, 2000, Redback completed the acquisition of Abatis Systems in a deal valued at $636 million, then the largest private acquisition in Canadian history.  Defendants issued 5.2 million shares of Redback stock in exchange for all of the outstanding shares, options and warrants of Abatis Systems.

39.     On October 11, 2000, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2000.  The press release stated, in relevant part, as follows:

Redback Networks, Inc., leading provider of advanced networking solutions, today reported record revenues for the quarter ended September 30, 2000, as well as its first profit on a pro forma basis since closing its merger with Siara Systems.

Net revenues for the third quarter of 2000 were $80.6 million, compared with $20.6 million for the same period in the prior year, an increase of  291 percent.  Pro forma net income for the third quarter of 2000 was $3.2 million or 0.02 per share diluted, which excludes acquisition-related and stock compensation charges.  This compares to the third quarter of 1999 pro forma net loss of  $569,000 or $(0.01) per share.  Before pro forma adjustments, net loss for the third quarter of 2000 was $308.1 million or $(2.50) per share compared to a net loss of $1.6 million or $(0.02) per share for the same period in the prior year.

40.     On January 17, 2001, the Company issued a press release announcing its financial results for its fourth quarter and year ended December 31, 2000.  The press release stated, in relevant part, as follows:

Net revenues for the fourth quarter of 2000 were $114.6 million, compared with $26.1 million for the same period in the prior year, an increase of 339 percent.  Pro forma net income for the fourth quarter of 2000 was $7.8 million or $0.05 per share diluted, which excludes acquisition-related and stock compensation charges.  This compares to the fourth quarter of 1999 pro forma  net income of $2 million or $0.02 per share diluted.  Before pro forma adjustments, net loss for the fourth quarter of 2000 was $327.6 million or $(2.47) per share compared to net income of $1.2 million or $.01 per share diluted for the same period in the prior year.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 9 -

For fiscal year 2000, net revenues were $278.0 million, an increase of 333 percent from the $64.3 million posted in 1999. Pro forma net income for the fiscal year was $6.8 million or $0.04 per share diluted, which excludes acquisition-related and stock compensation charges. Before pro forma adjustments, net loss for fiscal 2000 was $1.0 billion or $(8.68) per share compared to net loss of $7.9 million or $(0.15) per share for the prior year.

41.    In this same, January 17, 2001, press release defendant Ragavan was quoted as stating:

"Redback continued to achieve key objectives during the fourth quarter of 2000," said Vivek Ragavan, chief executive officer and president of Redback. "From a financial perspective, we delivered another profitable quarter with record revenue and net income. Equally important was the strong global demand for both our next generation products, the SMS 10000 and SmartEdge 800, as well as our industry-standard SMS 500 and SMS 1800 subscriber management systems. We continue to consolidate our market position as a leading vendor of broadband subscriber management systems and next-generation metro optical solutions."

During the quarter, the company expanded its global presence with new distribution agreements in Europe and Asia. International revenue grew 121 percent sequentially, reflecting design wins at Korea Telecom and Belgacom S.A., among others. "The international markets are in the early phases of implementing their broadband access strategies," remarked Ragavan. "With global customer base and growing international presence, our strong cash position and powerful product portfolio, we begin 2001 well positioned to capitalize on the coming migration to next generation broadband and metro optical networks.

42.    On February 5, 2001, Redback announced that Qwest had agreed to a multi-year, multi-million dollar purchase of the Redback SmartEdge 800. Again, the announcement did not specify the duration or specific amount of any contract with Qwest. The press release stated in part, as follows:

Qwest plans to deploy the SmartEdge 800 multi-service optical platform as part of its strategy to enhance and expand local broadband services for businesses and consumers in key metropolitan markets.

The SmartEdge 800 features high port densities to efficiently aggregate Internet Protocol (IP) and traditional time division multiplexing (TDM) traffic, delivering operational efficiencies for Qwest and simplifying the migration to IP for customers.

"We're pleased to extend our successful relationship with Redback to accelerate the delivery and enhance the efficiency our 1P-based metropolitan networks," said Augie Cruciotti, Qwest's executive vice president of national local networks. "We look forward to continuing our relationship with Redback to further improve service for our customers."

"Since embarking on the design of the Smartfldge 800, Redback has strongly believed that a successful metropolitan optical device must support providers delivering both TDM- as well as IP-based services," said Vivek Ragavan, Redback's

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 10 -

president and chief executive officer.  "As a result, we are very pleased to be a part of Qwest's all-optical metro network initiative."

43.    Defendants knew that the preceding statements were materially false and misleading because they failed to disclose that:

(a)    Qwest had only agreed to make the large purchases of Redback products it did not want or need in exchange for receiving free shares of Redback stock;

(b)    Redback was giving shares of its stock to Qwest insiders in exchange for sales contracts from Qwest; and

(c)    Qwest had no obligation to make further purchases from Redback.

44.    On April 11, 2001, the Company issued a press release announcing its financial results for its first quarter ended March 31, 2001.  The press release stated, in relevant part, as follows:

Net revenue for the first quarter of 2001 was $90.9 million, compared with $34.2 million for the same period in the prior year, an increase of 166 percent.  Pro forma net loss for the first quarter of 2001 was $18.4 million or $0.13 per share, which excludes acquisition-related charges, stock compensation charges, restructuring and certain inventory charges.  This compares to pro forma  diluted net income of $0.05 per share for Q4 2000 and $0.01 per share for the same period one year ago.  Before pro forma adjustments, net loss for the first quarter of 2001 was $400.5 million or $2.92 per share compared to a net loss of $85.2 million or $0.96 per share for the same period in the prior year.

45.    On April 19, 2001, the Company conducted a registered secondary offering of 2,440,526 shares of the Company's common stock.  Defendants Wolf, Ragavan, Khosla, and Lamond signed the Registration Statement filed in connection with the offering and last amended on April 17, 2001.

46.    On July 11, 2001, the Company issued a press release announcing its financial results for its second quarter ended June 30, 2001.  The press release stated, in relevant part, as follows:

Net revenue for the second quarter of 2001 was $59.4 million, compared with $48.7 million for the same period in the prior year.  Pro forma net loss for the second quarter of 2001 was $37.0 million or $0.26 per share, compared to pro forma net loss of $0.13 per share for Q1 2001 and $0.05 per share loss for the same period one year ago.

47.     On October 10, 2001, the Company issued a press release announcing its financial results for its third quarter ended September 30, 2001.  The press release stated, in relevant part, as follows:

> Net revenue for the third quarter of 2001 was $37.0 million, compared with $59.4 million in the prior quarter and $80.6 million for the same period in the prior year.

48.     On January 16, 2002, the Company issued a press release announcing its financial results for its fourth quarter and year ended December 31, 2001.  The press release reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2001 was $40.2 million, compared with $37.0 million in the prior quarter.  For the full fiscal year 2001 net revenue was $227.5 million compared to $278.0 million in fiscal year 2000.

> The GAAP net loss for the fourth fiscal quarter was $0.67 per share compared to a loss of $21.71 in Q3 2001.  For fiscal 2001 the GAAP loss was $28.78 per share compared to an $8.68 loss in fiscal 2000.  The GAAP loss in fiscal Q3 2001 included a write down of goodwill aggregating $2.7 billion.

49.     As reported by Redback's 2001 Form 10-K filed March 27, 2002, Qwest was Redback's largest customer.  The 2001 Form 10-K reported that:

> During 2001, our top two customers, Qwest Communications and Verizon, accounted for 18% and 15% of our revenue, and during 2000, our top two customers, Qwest Communications and Genuity, accounted for 15% and 10% of our revenue. Both of these customers are in the telecommunications industry, which has been depressed recently.  In addition, significant consolidation has occurred recently in the telecommunications sector, and we therefore anticipate that a large portion of our revenues will continue to depend on sales to a limited number of customers. Moreover, the competition to sell products to this limited customer base has increased significantly.  We do not have contracts or other agreements that guarantee continued sales to these or any other customers.  If any one or more of these customers were to top purchasing our products or significantly reduce their purchases and if we were unable to replace these customers with other significant customers, our revenues would significantly decline, and our results of operations would suffer.

50.     On April 10, 2002, the Company issued a press release announcing its financial results for its first quarter of 2002.  The press release reported, in relevant part, as follows:

> Net revenue for the first quarter of 2002 was $40.6 million, compared to $40.2 million in the prior fiscal quarter and $90.9 million for the same quarter in the prior year.

> The GAAP net loss for the quarter ended March 31, 2002 was $0.23 per share compared to a loss of $0.67 in fiscal Q4 2001 and $2.92 in fiscal Q1 2001.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 12 -

51.     On July 10, 2002, the Company issued a press release announcing its financial results for its second quarter of 2002.  The press release reported, in relevant part, as follows:

> Net revenue for the second quarter of 2002 was $40.1 million, compared to $40.6 million in the prior fiscal quarter and $59.4 million for the same quarter in the prior year.
>
> Pro-forma net loss for the quarter was $0.16 per share compared to a loss of $0.19 in Q1 2002 and a loss of $0.26 in the second fiscal quarter of 2001.

52.     On October 9, 2002, the Company issued a press release announcing its financial results for its third quarter of 2002.  The press release reported, in relevant part, as follows:

> Net revenue for the third quarter of 2002 was $17.4 million, compared to $40.1 million in the prior fiscal quarter and $37.0 million for the same quarter in the prior year.
>
> Pro forma net loss for the quarter was $0.20 per share, compared to a loss of $0.16 in fiscal Q2 2002 and a loss of $0.28 in the third fiscal quarter of 2001.

53.     On January 15, 2003, the Company issued a press release announcing its financial results for its fourth quarter of 2002 and fiscal 2002.  The press release reported, in relevant part, as follows:

> Net revenue for the fourth quarter of 2002 was $27.6 million, compared with $17.4 million in the prior quarter. For the fiscal year 2002, net revenue was $125.6 million compared to $227.5 million in fiscal year 2001.
>
>                         *        *        *
>
> The GAAP net loss for the fourth quarter of 2002 was $0.20 per share compared to a net loss of $0.30 in the prior quarter. For fiscal year 2002 the GAAP net loss was $ 1.13 per share compared to a $28.78 net loss in fiscal year 2001.

54.     On April 16, 2003, the Company issued a press release announcing its financial results for the first quarter of 2003.  The press release reported, in relevant party, as follows:

> Net revenues for the first quarter of 2003 were $29.5 million, compared with $27.6 million for the fourth quarter of 2002 and $40.6 million for the first quarter of 2002.
>
> GAAP net loss for the first quarter of 2003 was $24.9 million or $0.14 per share compared to a net loss of $34.7 million or $0.23 per share in the first quarter of 2002. Non-GAAP net loss for the first quarter of 2003 was $23.2 million or $ 0.13 per share compared to $29.0 million or $0.19 per share in the first quarter of 2002. Non-GAAP results exclude amortization of intangible assets, stock-based compensation, and realized gain on certain investments.

55.     On July 7, 2003, the Company announced that announced that on June 23, 2003 it received a decision from the Nasdaq's Listing Qualifications Panel granting Redback's request for an

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 13 -

1  exception to the National Market's minimum bid price requirement, as set forth in Nasdaq

2  Marketplace Rule 4450(a)(5).  According to the press release, the Panel determined to provide

3  Redback with additional time to allow for developments in the SEC's rulemaking process and that

4  accordingly, Redback then had until August 23, 2003 to regain compliance with Nasdaq's minimum

5  bid price requirement.  The Company also announced on July 7, 2003 that it had entered into a lock-

6  up agreement with holders of 67% of Redback's 5% Convertible Subordinated Notes due 2007

7  ("Notes") relating to a proposed recapitalization transaction involving a debt for equity exchange and

8  that as part of the recapitalization, the Notes would be exchanged for common stock.

9       56.     On July 16, 2003, the Company issued a press release announcing its financial results

10 for the second quarter of 2003.  The press release reported, in relevant part, as follows:

11          Net revenue for the second quarter of 2003 was $22.2 million, compared with $29.5
            million for the first quarter of 2003 and $40.1 million for the second quarter of 2002.
12
            GAAP net loss for the second quarter of 2003 was $51.0 million or $0.28 per
13          share compared to a GAAP net loss of $65.1 million or $0.40 per share in the second
            quarter of 2002.  Non-GAAP net loss for the second quarter of 2003 was $26.3
14          million or $0.15 per share compared to a non-GAAP net loss of $26.4 million or
            $0.16 per share in the second quarter of 2002.  Non-GAAP results exclude
15          amortization of intangible assets, restructuring charges, stock-based compensation,
            realized gain and write-off of certain investments and certain impairment and
16          inventory charges.

17      57.     On August 27, 2003, the Company announced it had received another extension from

18 the Nasdaq Listing Qualifications Panel.

19      58.     On October 2, 2003, Redback launched an exchange offer for all outstanding debt set

20 to expire at 12:00 midnight, New York City time, on October 30, 2003.

21      59.     The true facts which were known by each of the defendants, but concealed from the

22 investing public during the Class Period, were as follows:

23          (a)     Qwest had only agreed to make the large purchases of Redback products it did

24 not want or need in exchange for receiving free shares of Redback stock;

25          (b)     Redback was giving shares of its stock to Qwest insiders in exchange for sales

26 contracts from Qwest; and

27          (c)     Qwest had no obligation to make further purchases from Redback.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 14 -

60.     On October 10, 2003, the Company filed a SEC Form S-4, which was signed and certified by defendants DeNuccio and Cronan, stating, in relevant part, as follows:

One of our officers is facing a civil SEC lawsuit related to his previous employment, and any adverse determination may affect his ability to serve as an officer of our company.

On February 25, 2003, the SEC filed a civil lawsuit against eight current and former officers and employees of Qwest Communications, regarding activities that occurred while each was employed at Qwest.  One of the individuals named is Joel Arnold, our Senior Vice President of Strategy and Marketing, who was formerly Executive Vice President of Qwest's Global Business Unit.  The lawsuit alleges that Mr.  Arnold participated in activities intended to artificially accelerate Qwest's recognition of revenue in two equipment sale transactions.  The SEC is seeking, among other remedies, that Mr. Arnold and four other defendants be permanently barred from serving as an officer or director of any public company.

Although it is expected that such a civil procedure will take two to three years or longer to be adjudicated, an unfavorable result at the end of such action against Mr. Arnold may result in him being unable to serve as an officer.  In addition, Mr. Arnold may be distracted while defending against the allegations.

61.     A *Wall Street Journal* article released on October 14, 2003 states, in relevant part, as follows:

Regulatory filings by Redback said the Securities and Exchange Commission is looking into "certain equity investments" by Qwest.  Redback, based in San Jose, California, sold $81.5 million of goods and services to Qwest in 2000 and 2001, and bought about $13.5 million in services from Qwest, according to the filings.  A federal grand jury is investigating business  transactions between Denver-based Qwest and 11 of its vendors [including Redback] ....

The grand jury is investigating whether former Qwest executives took discounted stock from some vendors in exchange for giving them business, some of which Qwest may not have needed.

62.     On January 5, 2004, defendants announced that the Company's reorganization had been completed and that the restructuring included a 1-for-73 reverse stock split and the elimination of all the Company's $467 million in debt in exchange for half of the Company's equity.  While the shareholders owning the Company's 183 million shares before the reorganization owned $40.26 million in market capitalization, by doing the 1-for-73 stock split, then creating another 47.5 million shares which were distributed to the Company's former bondholders, plus another 2 million shares for miscellaneous creditors, the number of post-reverse-split shares outstanding now totals about 52  million, most of which are owned by the former bondholders.  As a result, due to the extra debt

defendants caused the Company to take on to cover up their misstatements, the public shareholders have been stripped of 50% of their equity interest in this growth Company.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

63.    Plaintiff incorporates ¶¶1-62 by reference.

64.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Redback publicly traded securities during the Class Period.

66.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Redback publicly traded securities. Plaintiff and the Class would not have purchased Redback publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

67.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Redback publicly traded securities during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violation of §20(a) of the 1934 Act
Against All Defendants**

68.    Plaintiff incorporates ¶¶1-67 by reference.

69.    The Individual Defendants acted as controlling persons of Redback within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Redback, and their ownership of Redback stock, the Individual Defendants had the power and authority to cause Redback to engage in the wrongful conduct complained of herein.  Redback controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

70.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Redback publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants.

71.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Redback had more than 183 million shares of stock outstanding, owned by hundreds if not thousands of persons.

72.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or deliberately disregarded that their statements were false and misleading;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 17 -

1     (e)     Whether the prices of Redback's publicly traded securities were artificially

2 inflated; and

3     (f)     The extent of damage sustained by Class members and the appropriate

4 measure of damages.

5     73.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

6 sustained damages from defendants' wrongful conduct.

7     74.     Plaintiff will adequately protect the interests of the Class and has retained counsel,

8 who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

9 with those of the Class.

10     75.     A class action is superior to other available methods for the fair and efficient

11 adjudication of this controversy.

12                             **PRAYER FOR RELIEF**

13     WHEREFORE, plaintiff prays for relief and judgment, including preliminary and permanent

14 injunctive relief, as follows:

15     A.     Determining that this action is a proper class action, and certifying plaintiff as a class

16 representative under Rule 23 of the Federal Rules of Civil Procedure;

17     B.     Awarding preliminary and permanent injunctive relief in favor of plaintiff and the

18 Class against defendants and all persons acting under, in concert with, or for them, including an

19 accounting for and the imposition of a constructive trust and/or an asset freeze on defendants' ill-

20 gotten gains;

21     C.     Ordering an accounting of defendants' ill-gotten gains;

22     D.     Ordering disgorgement of defendants' ill-gotten gains;

23     E.     Awarding compensatory damages in favor of plaintiff and the other Class members

24 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

25 wrongdoing, in an amount to be proven at trial, including interest thereon;

26     F.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

27 action, including counsel fees and expert fees; and

28     G.     Such other and further relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 18 -

1

**JURY DEMAND**

2      Plaintiff demands a trial by jury.

3   DATED:  January 27, 2004                    MILBERG WEISS BERSHAD
                                                   HYNES & LERACH LLP
4                                              REED R. KATHREIN
                                               STANLEY S. MALLISON
5                                              ELI R. GREENSTEIN

6

7
                                               _____
8                                                       REED R. KATHREIN

9                                              100 Pine Street, Suite 2600
                                               San Francisco, CA  94111
10                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)

11                                             MILBERG WEISS BERSHAD
                                                   HYNES & LERACH LLP
12                                             WILLIAM S. LERACH
                                               401 B Street, Suite 1700
13                                             San Diego, CA  92101
                                               Telephone:  619/231-1058
14                                             619/231-7423 (fax)

15                                             SCHATZ & NOBEL, P.C.
                                               ANDREW M. SCHATZ
16                                             JEFFREY S. NOBEL
                                               NANCY A. KULESA
17                                             330 Main Street
                                               Hartford, CT  06106
18                                             Telephone:  860/493-6292
                                               860/493-6290 (fax)

19
                                               Attorneys for Plaintiff
20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 19 -

1

2

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

named parties, there is no such interest to report.

3

4

_____
ATTORNEY OF RECORD FOR
PLAINTIFF ERIK HANSEN

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28